UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
CENTRAL ISLIP

| | |
|---|---|
| S.G., on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>SYNCHRONY BANK,<br><br>     Defendant. | Case No. 2:24-cv-5788<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff S.G. ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following class action complaint (the "Action") against Defendant Synchrony Bank ("Defendant") under state law upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel as follows:

I.     NATURE OF THE ACTION

"When people seek medical care, they are in a particularly vulnerable situation. They are sick or injured, or maybe a loved one is in pain. They are usually filling in and signing multiple forms: insurance forms, HIPAA disclosures, and medical history paperwork. Unlike when they are at a bank or when they receive unsolicited mail, they are not "on guard" financially. They are not thinking carefully about the terms of a financial contract – fees, penalties, interest rates. Their focus is on getting physically better. **So it is particularly important that a credit card company offering personal lines of credit to pay for health care is doing everything to the letter of the law – that they are treating people fairly, with dignity, and with the utmost transparency.**"

– Former Consumer Finance Protection Bureau Director Richard Cordray on CareCredit, December 10, 2013

1.     In their most desperate moments – anxiously sitting in an emergency room, in a doctors' office, or in a veterinary emergency room – vulnerable consumers worry about their ability to pay for critical health bills. And, ultimately, when consumers are unable to pay for these

costs, they resort to desperate measures.  One of these desperate measures includes usurious loans in the form of credit cards to be able to provide the medical and veterinary care to the people, to their animals, and, in some cases, even to themselves, necessary to remain healthy (and often, to remain alive).

2.     Such a desperate measure is taking out an exploitative, high-interest rate loan from Synchrony Bank, that is offered at medical and veterinary offices around the country. These loans are marketed under the tradename "CareCredit," and they often carry extraordinarily high interest rates above and beyond what is permitted by New York's state usury law. Specifically, the interest rate on new CareCredit accounts is an astonishing 32.99% per annum as of May 30, 2024.  For consumers who may be late on payments the interest rate reaches as high as 39.99%.

3.     To compound such matters, these loans are offered to consumers at extremely vulnerable moments in their lives – and they are unable to grasp the potential financial ruin that awaits them when they ultimately choose to pull the trigger on one of these usurious loans.

4.     Against this backdrop, Plaintiff brings this Action against Defendant Synchrony Bank and their CareCredit product for violations of state usury laws and state consumer protection statutes, breach of good faith and fair dealing, and unjust enrichment.

5.     As such, Plaintiff S.G. seeks actual and treble damages, restitution, disgorgement of profits into a constructive trust, injunctive relief, a declaratory judgment stating that Defendant's lending practices violate usury laws and that any arbitration clauses in the agreements made by Plaintiff and Class members are void for public policy reasons, pre- and post- judgment interest, and reasonable costs and attorneys' fees.

## II.    JURISDICTION AND VENUE

6.    **Subject Matter Jurisdiction**.  This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), as the amount-in-controversy well exceeds $5,000,000, there are at least one hundred known members of the putative Class, and Plaintiff is of a different state than the Defendant. Namely, Plaintiff is a Washington, D.C. resident, while the Defendant, Synchrony Bank, is purportedly headquartered in the state of Utah.

7.    **Personal Jurisdiction**.  This Court has personal jurisdiction because a forum selection clause and choice of law provision on the website where the agreement entered into by Defendant and Plaintiff chooses New York as both the location to litigate this dispute as well as the law that should apply. Additionally, the Defendant offers services in this District, is registered to do business in this state, markets CareCredit products in this state, and otherwise directs commerce to this state. Finally, Plaintiff was a citizen of this District when he entered the agreement with Defendant.

8.    **Venue**.  Venue is proper because the agreement at issue chooses "the state and federal courts of New York" as the exclusive venue for disputes between Plaintiff and Defendant.[1]

## III.    PARTIES

### *Plaintiff S.G.*

9.    Plaintiff S.G. is a resident of the District of Columbia.

10.    Plaintiff S.G. has a CareCredit account and was harmed by Defendant's conduct as alleged herein. Plaintiff S.G. has had a CareCredit account since 2021, for which he signed up online and for which the online terms of use govern. *See* ¶ 8 fn 1, *supra*.  At the time that Plaintiff

---

[1] *See* https://www.carecredit.com/online-usage-agreement/ (noting that "these Terms and Conditions shall be governed by the laws of the State of New York and the federal laws of the United States of America" and [f]or all disputes arising from or related to the Site, you agree to submit to the personal and exclusive jurisdiction of the state and federal courts of New York.") (Last visited August 15, 2024).

signed up for his account, he was domiciled in New York and lived temporarily in Connecticut. Plaintiff remained a resident of New York until 2024, when he moved to the District of Columbia. In all three jurisdictions, he was harmed by paying usurious interest rates for his CareCredit loan.

11.     Under Connecticut, New York, and District of Columbia law, Plaintiff's CareCredit loan violates state usury laws.

### Defendant Synchrony Bank

12.     Defendant Synchrony Bank is a National Banking Association chartered as a Federal Savings Bank with its principal place of business located in Utah at 170 Election Road, Suite 125, Draper, Utah.

13.     One of Synchrony's most popular financial products is called CareCredit, which is the subject of this Action.

IV.    **FACTUAL ALLEGATIONS**

**DEFENDANT'S BUSINESS**

14.     Defendant is a publicly traded consumer financial services company traded on the New York Stock Exchange.

15.     According to Defendant, "Synchrony is a premier consumer financial services company delivering customized financing programs across key industries, including retail [and] health… [w]ith more than $166 billion in sales financed and 72.4 million active accounts."[2]

16.     One such financing program offered by Defendant is called CareCredit. According to Defendant, "the CareCredit credit card is accepted at more than 250,000 enrolled provider and health-focused retail locations and is used by more than 11 million+ cardholders…. [Cardholders]

---

[2] *Id.*

are even using their card for copayments, deductibles, and prescriptions as out-of-pocket costs continue to rise."[3]

17.     For all new accounts, the interest rate for CareCredit is fixed at 32.99%.

18.     According to Defendant's Securities and Exchange quarterly filing from Q1 of 2024, Defendant made $911 million on interest and fees from 7.75 million CareCredit accounts in the first quarter of 2024.

19.     Indeed, Defendant states in its annual Securities and Exchange Commission filing from 2021 that "[w]e generate revenue in CareCredit primarily from interest[.]"[4] In year ended December 31, 2020, CareCredit's services were found in the following subcategories: dental (59% of CareCredit transactions), veterinary (21%), cosmetic dermatology (10%), vision-related services (5%), audiology (2%), and other markets (3%).[5] According to the 10-K, "[d]uring 2020, over 195,000 locations either processed a CareCredit application or made a sale on a CareCredit credit card."[6]

## THE CARECREDIT PRODUCT AND CONSUMER HARM

### A.  Usury Laws

20.     A majority of U.S. states have usury laws to protect consumers from unfair and abusive interest rates. The maximum rate under usury law is the highest amount that a lender can charge on a loan.

21.     On a state-by-state basis, usury limits are as follows:

---

[3] https://www.carecredit.com/about/, (last accessed Aug. 1, 2024).

[4] *Id.* at 13.

[5] *Id.* at 14.

[6] *Id.*



Note: 50 represents the states without a set interest rate limit.

                                                                                          www.lawdistrict.com

22.     There are serious public policy concerns tied into preventing usurious lending – as here.

23.     Historically, state usury laws reflect a calculated judgment that charging for loans above certain rates exploits vulnerable people and injures the public. In many states that have usury laws, those laws are considered fundamental public policies of those respective states. For

example, in New York, "New York's usury prohibition constitutes fundamental public policy." *See, e.g. Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017).

24.    And yet, for the centuries in which usury laws have existed, nefarious lenders have sought to evade them.

25.    For example, victims of usurious, predatory lending have had a hard time recovering damages from lenders under the usury laws. The problem, historically, is that lenders ascribe to "rent-a-bank" schemes, which insulate lenders from usury laws. Specifically, lenders claim that, under federal banking law, if a non-bank lender merely associates with a bank (under the "True Lender Rule") located in a state without limits on usurious lending laws, they can then transact business with financially vulnerable populations who then become victims of usury through loans and credit cards.

26.    However, the True Lender Rule and shielding banks from usury laws does not comport with American values or jurisprudence. As Chief Justice Marshall stated in 1835: "The ingenuity of lenders has devised many contrivances, by which, under forms sanctioned by law, the [usury] statute may be evaded … Yet it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the true nature of the transaction. If that be in fact a loan, no shift or device will protect it." *Scott v. Lloyd*, 34 U.S. 418, 446–47 (1835).

27.    Currently, states and the federal government have taken a more litigious approach to regulate usurious lenders. In 2021, the United States Congress voted to overturn the True Lender Rule which insulated non-bank lenders from usury litigation. Furthermore, President Biden's then-

Acting Comptroller of the Currency Michael J. Hsu stated at the time, "I want to reaffirm the agency's long-standing position that predatory lending has no place in the federal banking system."

**B. How CareCredit Works**

28.     CareCredit is offered by at least 260,000 enrolled providers who know that their consumers may not be able to afford the services they offer — especially in the context of medical and veterinary services.[7]

29.     CareCredit works as follows: a consumer walks into a medical or veterinary services provider. Once there, and once the medical or veterinary professional has evaluated what services are necessary, the consumer is given the option to pay using either insurance or some combination of cash and/or credit card. Then, if the consumer is unable to pay, the consumer is offered CareCredit — a credit card account that provides a line of credit for exactly the amount needed (or more, based on an evaluation of creditworthiness) in order to pay the bill that is presented. Then, the consumer, in the medical or veterinary office and grappling with a medical (or veterinary) ailment, quickly fills out the necessary paperwork to be approved for a CareCredit account. The office's bill is paid directly by the consumer's new line of credit for the services offered or rendered.

30.     As Defendant admits about CareCredit, "[a]ccording to a 2020 survey of our CareCredit customers, 47% indicated they would have postponed or reduced the scope of treatment if [CareCredit] was not offered by their provider."[8] This is tantamount to a smoking gun: nearly half of CareCredit consumers felt they had no choice but to use CareCredit, otherwise they would

---

[7] https://www.carecredit.com/apply/, (last accessed Aug. 1, 2024).

[8] Synchrony Financial Services 10-K, S.E.C. 2021 Annual Report, at 15. https://www.sec.gov/edgar/browse/?CIK=1601712&owner=exclude#. (last visited Aug. 1, 2024).

have either "postponed or reduced the scope of treatment." At this juncture, CareCredit knows that the consumer has no choice but to accept whatever terms are offered to be able to pay for the service.

31.    As such, CareCredit uses this opportunity to engage in predatory lending tactics.

**C. How CareCredit Harms Consumers**

32.    The costs of medical and veterinary services continue to rise in the United States.

33.    For example, the price of medical services increased between 4.3% and 4.7% every year from 2017 through 2019.[9] These costs, coupled with inflation, are not sustainable for U.S. citizens who pay out-of-pocket for their healthcare or who are forced to pay the difference in their healthcare expenses when their insurance provider fails to do so.

34.    Defendant is aware of this, and its CareCredit product is designed to address the gaps that the healthcare system leaves unbridged for consumers, at the consumers' expense.

35.    CareCredit acknowledges on its website that bills in the medical context can be thousands of dollars for simple tasks like imaging (e.g. an MRI is $1,390), and that standard visits with a specialist can cost hundreds of dollars before even administering care (e.g. a standard Urology or Neurology appointment is $381 for the cost of being seen).[10]

36.    Additionally, the price of veterinary services have increased even more than the cost of human medical services – to the tune of 7.2% in 2021 alone.[11] These costs, coupled with inflation, are not sustainable for U.S. pet owners who generally pay 100% of the costs of veterinary

---

[9] https://www.ama-assn.org/about/research/trends-health-care-spending, (last accessed Aug. 1, 2024).).

[10] https://www.carecredit.com/hospital-medical-billing/, (last accessed Aug. 1, 2024).

[11] https://blog.healthypawspetinsurance.com/cost-of-veterinary-care-spending-on-pets-continues-to-rise, (last accessed Aug. 1, 2024).

and emergency veterinary care before any sort of coverage is applied by a pet insurance policy, if any exists.

37.    Synchrony is also aware of this, and the CareCredit product is designed to address a similar dearth of the ability of consumers to pay for the surging price in veterinary and emergency veterinary care. What is even more disturbing about CareCredit in the veterinary context is that veterinary care providers often do not administer live-saving care unless the consumer has demonstrated the ability to pay for that care in advance. This, in practice, means that the consumer is forced to pay whatever price the veterinary services provider asks – especially in dire situations. And, when the consumer is unable to pay and is faced with the health (or even the potential death) of the beloved pet, the consumer concedes to CareCredit's terms, whatever they may be, regardless of the state of duress that the consumer might be under when agreeing to CareCredit's usurious interest rate and unlawful terms.

38.    Synchrony even states on its website that the average cost of an emergency veterinary bill is between $800–$1,500.[12] At a 32.99% annual interest rate, that means that the consumer can potentially end up paying thousands of dollars in interest for a loan that provided $1,000 of care to an animal in a veterinary services context. A study of medical debt in 2019 showed that CareCredit accounts had the highest amount of median debt held, $1,443 in debt, which far outpaced others such as Kaiser Permanente ($287).

39.    CareCredit is keenly aware of all of this; its product is designed to take advantage of the flaws in the medical and veterinary services industries on the backs of unwitting consumers that they eventually crush under a mountain of debt.

---

[12] https://www.carecredit.com/well-u/pet-care/emergency-vet-visit-cost-and-veterinary-financing/, (last accessed Aug. 1, 2024).

40.    The CareCredit scheme — forcing consumers to pay extraordinarily high interest rates in exchange for lifesaving care — has negatively affected all sorts of consumers who need medical and veterinary services.

41.    On WalletHub, a consumer finance reviews website, the reviews for CareCredit are astoundingly negative; many reviews were rated two stars (out of five) or below — with a slew of complaints about the interest rates charged by Defendant for the CareCredit product.[13]

42.    Consumers on WalletHub also call attention to Defendant's confusing "no interest" marketing for the CareCredit product. Although not the subject of this Action, consumers specifically complain on WalletHub that the CareCredit website states that no interest is charged with shorter financing options. However, this only applies "when you make the minimum payments and pay the full amount due by the end of the promotional period."[14]

43.    The exploitation and the cycle of debt that CareCredit perpetuates harms all sorts of victims — including regulators themselves.

44.    For example, in October 2021, New York State Assembly member Emily Gallagher's cat Roland Barthes needed emergency veterinary care. Assembly member Gallagher tweeted:

> "Roland Barthes is out of surgery & stable. We will be picking him up tonight. I want to mention that I was initially charged $3,797 and told it had to be paid upfront. I couldn't. So I had to negotiate for hours and beg friends and family. When it became clear I really couldn't pay, we were offered a high interest loan, which we were forced to take. I love Roland and wouldn't let him die for an easily curable illness. But this financial situation is exploitative. Animal neglect and cruelty is a crime. Taking care of our furry friends should be within reach for all pet owners […] believe me, legislation will follow."

---

[13] https://wallethub.com/profile/carecredit-14738526i, (last accessed Aug. 1, 2024).

[14] https://www.carecredit.com/howcarecreditworks/prospective/, (last accessed Aug. 1, 2024).

45.     Assembly member Gallagher's experience is shockingly common and nearly identical to the experience of Plaintiff S.G. in March 2021.

46.     Additionally, CareCredit has been the subject of scrutiny before due to its consumer-facing practices. Indeed, in 2013, the United States Consumer Financial Protection Bureau ("CFPB") ordered

> CareCredit [] to refund up to $34.1 million to potentially more than 1 million consumers who were victims of deceptive credit card enrollment tactics. At doctors' and dentists' offices around the country, consumers were signed up for CareCredit credit cards they thought were interest free, but were actually accruing interest that kicked in if the full balance was not paid at the end of a promotional period.[15]

47.     As relevant here, the CFPB's Former Director, Richard Cordray, stated, "Medical debt is already a big problem for many Americans. … The Bureau will not tolerate financial companies that take advantage of patients and their loved ones."[16] The Bureau stated, "During the course of its investigation, the Bureau found evidence of (1) [d]eceptive enrollment practices, … (2) [i]nadequate disclosures, ... and (3) [p]oorly trained staff."[17]

48.     As the CFPB identified nearly a decade ago: "CareCredit [is] an area of concern that can pose risks for consumers… The interest rate on these cards is often substantially higher than the rate on standard general-purpose credit cards."[18]

**D.  Plaintiff's Experience with CareCredit**

---

[15]     https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-ge-carecredit-to-refund-34-1-million-for-deceptive-health-care-credit-card-enrollment/, (last accessed Aug. 13, 2024); *see also*, *In the Matter of GE Capital Retail Bank, CareCredit LLC*, File No. 2013-CFPB-0009 (2013) (hereinafter, "Consent Order").

[16] *Id.*

[17] *Id.*

[18]     https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-ge-carecredit-to-refund-34-1-million-for-deceptive-health-care-credit-card-enrollment/, (last accessed Aug. 1, 2024).

49.    In March 2021, a cat named 'Pumpkin' under Plaintiff's care became critically ill.

50.    Plaintiff, being a responsible cat owner, brought Pumpkin to an emergency veterinary center in Connecticut, where he was temporarily domiciled at the time of Pumpkin's illness.

51.    Plaintiff was told that Pumpkin would need over $2,000 of medical treatment if Pumpkin were to survive the illness and/or ailments that Pumpkin was suffering from at that time.

52.    Plaintiff was unable to pay the bill to the emergency veterinary center in full, and was forced to pay for Pumpkin's treatment prior to the treatment. Faced with no other alternatives to keep Pumpkin alive, Plaintiff was presented with CareCredit as an option by the emergency veterinary center. Plaintiff, in a state of duress and severe stress, agreed to CareCredit's terms when they were essentially forced upon him.

53.    Additionally, between 2021 and 2023, Plaintiff used CareCredit for his own medical expenses, including optometrist visits, chiropractic care, and other medical necessities. Desperate to afford this medical care, Plaintiff was forced to use his CareCredit account or face the possibility of forgoing necessary evaluation and treatment. Plaintiff has since ceased using CareCredit.

54.    Initially, and under duress, Plaintiff agreed to an unlawful interest rate in excess of both the civil and criminal usury laws in the State of New York, currently at 32.99%. He is now a resident of the District of Columbia and continues to accrue interest on the balance he owes to CareCredit.

55.    According to his account statement, if Plaintiff makes the minimum payments on the account for the initial $2,000 loan into the foreseeable future, he will have paid off the balance in **14 years for a total of $7,752**.

**E. Applicable Law**

56.     **New York Law Applies.**  New York law applies because consumers sign up for CareCredit online and CareCredit's website contains a venue and choice of law provision that designates New York's law as applicable and New York courts as the correct forum. *See* ¶ 8 fn 1, *supra*.

57.     Additionally, because the website's Term of Use designates New York as the proper law and venue, New York has a compelling interest in protecting the rights of both New York residents as well as all users who agreed to CareCredit's terms while signing up under the OUA.

58.     **New York's Usury Law.**  Because New York law applies under the OUA, New York's usury laws apply.

59.     According to a recent New York Court of Appeals opinion:

> New York usury law is composed of General Obligations Law §§ 5-501, 5-511, 5-521; Banking Law § 14-a(1) and Penal Law § 190.40. Together, the statutes establish that loans of less than $250,000 to individuals cannot exceed a 16% annual rate… More specifically, the General Obligations Law and Banking Law provide that the maximum rate of interest upon a "loan or forebearance of any money, goods, or things" shall be 16% per annum… In addition, a lender commits a class E felony when, without other legal authorization, the lender "knowingly charges, takes, or receives money or other property as interest on the loan or forebearance of any money or other property, at a rate exceeding 25% per annum…"

*See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 326 (2021).

60.     In *Adar Bays*, the history and purpose of the criminal usury statute is further explained: "To understand New York's current usury laws, it is important to examine their history," which stems back to at least 1717. *Id.* at 327. *Adar Bays* says that, historically, if a loan is "found to be usurious, the lender forfeited not just the principal and the interest, but three times

the value of the interest." *Id.* (citing *Curtiss v. Teller*, 157 App. Div. 804, 810 (4th Dep't 1913), *aff'd* 217 NY 649 (1916); 1 Colonial Laws of NY at 910) (*emphasis added*).

61.     *Adar Bays* also states that the criminal usury statute was passed (with additional civil protections) in part because it was "vital in curbing the loan-shark racket." *Id.* at 331.

62.     Additionally, the Court of Appeals held in *Adar Bays* that agreements which contain loans, pursuant to General Obligations Law § 5-551, that violate usury laws in the State of New York are considered to be "void" ab initio. *Id.*

63.     Thus, the agreements made between Defendant and Plaintiff are void ab initio – and every term included in them, made between every member of the putative Class and the Defendant, are also void ab initio.

## V.     CLASS ALLEGATIONS

64.     Pursuant to Federal Rule of Civil Procedure Rule 23, Plaintiff seeks to certify a class of persons who fall under the following definition (collectively, the "Class"):

> **Class Definition.** All CareCredit account holders who signed up on CareCredit's website in the United States and accrued interest above 16% per annum during the applicable statutory period.

65.     Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

66.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

67.    Numerosity – Federal Rule of Civil Procedure 23(a)(1). The members of the Class are so numerous that individual joinder of all Class Members is impracticable. On information and belief, Class Members number in the hundreds of thousands to millions. The precise number or identification of members of the Class are presently unknown to Plaintiff but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

68.    Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting individual members of the Class. These common questions of law or fact include, but are not limited to, the following:

    i.   whether Defendant violated New York's civil usury laws;

    ii.   whether Defendant violated New York's criminal usury laws;

    iii.   whether Defendant breached the covenant of good faith and fair dealing;

    iv.   whether Defendant was unjustly enriched due to the conduct complained of herein;

    v.   whether Defendant's conduct consisted of a deceptive act or practice under New York General Business Law 349; and

    vi.   whether Plaintiff and the Class are entitled to damages, statutory damages, and/or injunctive relief.

69.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved.

Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

70.     Typicality – Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

71.     Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the Class because he is a member of the Class and his interests do not conflict with the interests of the Class Members he seeks to represent. Plaintiff has retained counsel competent and experienced in complex commercial and class action litigation. Plaintiff and his counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

72.     Superiority – Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.

By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
### VIOLATIONS OF NEW YORK'S USURY LAWS
### (General Obligations Law §§ 5-501, 5-511, 5-521;
### Banking Law § 14-a(1);
### and Penal Law § 190.40)

73.     Plaintiff hereby incorporates by reference the foregoing allegations as if fully set forth herein.

74.     New York usury law is composed of General Obligations Law §§ 5-501, 5-511, 5-521; Banking Law § 14-a(1); and Penal Law § 190.40.

75.     According to *Adar Bays*,

> together, the above-listed statutes establish that loans of less than $250,000 to individuals cannot exceed a 16% annual rate… More specifically, the General Obligations Law and Banking Law provide that the maximum rate of interest upon a "loan or forebearance of any money, goods, or things" shall be 16% per annum… In addition, a lender commits a class E felony when, without other legal authorization, the lender "knowingly charges, takes, or receives money or other property as interest on the loan or forebearance of any money or other property, at a rate exceeding 25% per annum.

37 N.Y.3d at 326.

76.     Defendant's CareCredit product offers a loan in exchange for repayment with an additional annual rate of interest in excess of both the civil and criminal usury statutes in the state of New York (32.99%).

77.     The usury laws apply to Defendant, as, per the statute, "a person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, [they] knowingly charge[], take[] or receive[] any money or other property as interest on the loan or

forebearance of any money or property, at a rate exceeding [25%]per annum or the equivalent rate for a longer or shorter period." P.L. § 190.40.

78.     Thus, Defendant's CareCredit product violates both the civil and criminal usury statutes in New York and under New York usury laws.

79.     Additionally, *Adar Bays* found that agreements which violate these provisions are void ab initio. Thus, the agreements, as well as every term included in them, made between Defendant and Plaintiff (and every member of the putative Class) are void ab initio.

80.     Plaintiff seeks restitution as well as damages, inclusive of the principal of the loans agreed to, the interest accrued, the trebling of interest accrued and the cancellation of the loans at issue. Plaintiff seeks a declaratory judgment stating that the agreements made between Defendant and Plaintiff are void ab initio. Furthermore, Plaintiff seeks an injunction ending CareCredit's issuance and collection of loans that have interest rates above New York's usury law.

<u>**COUNT II**</u>
**VIOLATION OF NEW YORK'S DECEPTIVE TRADE PRACTICES STATUTE**
**(Gen. Bus. Law § 349)**

81.     Plaintiff hereby incorporates by reference the foregoing allegations as if fully set forth herein.

82.     New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

83.     Defendant's actions occurred in the conduct of business, trade, or commerce.

84.     Defendant's conduct, as described in this Action, constitutes "deceptive acts or practices" within the meaning of the New York General Business Law.

85.     All of Defendant's deceptive acts and practices constitute conduct directed at consumers, i.e., Plaintiff and the members of the putative Class. The definition of "consumers" under this statute is meant to be interpreted expansively.

86.     Defendant's foregoing deceptive and unfair acts and practices, including its omissions, were and are deceptive acts or practices in violation of the New York General Business Law § 349, Deceptive Acts and Practices, et seq., including that Defendant:

     **a.**  offered unlawful, usurious loans to consumers while consumers were unlikely in a position to refuse said loans;

     **b.**  marketed its CareCredit product as a financially responsible loan when, in reality, it was not; and,

     **c.**  directed its unlawful, usurious loans to consumers in dire and sometimes life-altering situations where they otherwise could not carefully evaluate the terms of said loans.

87.     Defendant's unconscionable, deceptive, and/or unfair practices caused actual damages to Plaintiff and the putative Class Members.

88.     Plaintiff and members of the putative Class were deceived despite acting reasonably under the circumstances.

89.     As a direct and proximate result of Defendant's deceptive acts and practices, including its omissions, Plaintiff and the putative Class members have been damaged as alleged herein and are thus entitled to recover actual damages to the extent permitted by law in an amount to be proven at trial.

90.     In addition, Plaintiff and the putative Class members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, in addition to reasonable attorneys' fees and costs.

91.     In addition, Defendant's conduct showed malice, motive, and the reckless disregard such that an award of punitive damages is appropriate.

## COUNT III
## BREACH OF GOOD FAITH AND FAIR DEALING

92.    Plaintiff hereby incorporates by reference all the foregoing allegations as if fully set forth herein.

93.    Plaintiff and each Class member entered into one or more contracts with Defendant.

94.    Inherent in each contract was a covenant of good faith and fair dealing based on each party's reasonable expectation that the other party would not act in a way that would deny the other party the benefits which that other party contracted.

95.    One such reasonable expectation was Defendant's implied promise to not insert unconscionable provisions into the agreement with Plaintiff.

96.    Yet, Defendant breached the covenant of good faith and fair dealing by inserting illegal and unlawful interest rates into their credit card agreements. And Defendant did so when Plaintiff had no other discernable option but to accept those unconscionable provisions.

97.    Defendant's breaches of the covenant of good faith and fair dealing damaged each Class member to the extent that the interest rates in said agreements were extremely harmful both financially and emotionally.

## COUNT IV
## UNJUST ENRICHMENT
### (alternative claim)

98.    Plaintiff hereby incorporates by reference the foregoing allegations as if fully set forth herein.

99.    Plaintiff and the other members of the putative Class conferred benefits on Defendant by taking out a CareCredit loan and/or line of credit, and by paying the interest that accrued thereafter.

100.    Defendant has been unjustly enriched in retaining the revenues derived from the Plaintiff and the other members of the putative Class.

101.    Retention of those monies under these circumstances is unjust and inequitable because Defendant's CareCredit loans and/or lines of credit are unlawful and usurious, which caused injuries to Plaintiff and the other members of the putative Class.

102.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the putative Class is unjust and inequitable, Defendant must disgorge the profits it has made, and pay restitution to Plaintiff and the other members of the putative Class for its unjust enrichment, as ordered by the Court.

## VI.    DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class Members, respectfully requests that the Court enter judgment and order relief against Defendant as follows:

a)  for an order declaring: (i) this is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the proposed Class described herein; and (ii) appointing Plaintiff to serve as a representative for the Class and Plaintiff's counsel to serve as Class Counsel;

b)  for an order enjoining Defendant from continuing to engage in the unlawful conduct set forth herein;

c)  for an order awarding restitution of the money Defendant wrongfully acquired by its illegal and deceptive conduct;

d)  for an order requiring disgorgement of the money Defendant wrongfully acquired by its illegal and deceptive conduct;

e)  for the creation of a constructive trust in order to hold disgorged profits;

f)  for compensatory and punitive damages, including actual and statutory damages, arising from Defendant's wrongful conduct and illegal conduct;

g)  for damages to include, but not limited to, the principal of the loans made as well as the amount of interest trebled;

h)  for a declaratory judgment declaring that Defendant's agreements with Plaintiff and the putative Class are void ab initio in their entirety;

i)  for a declaratory judgment declaring the Defendant's arbitration provision is void as a matter of public policy;

j)  for an award of reasonable attorneys' fees and costs and expenses incurred in the course of prosecuting this action; and

k)  for such other and further relief as the Court deems just and proper.

VII.   JURY TRIAL DEMAND

103.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Date: August 19, 2024

/s/ Javier Merino
Javier L. Merino (NY 5294699)
Brian D. Flick (OH 0081605)*
**DannLaw**
1520 US Highway 130, Suite 101
North Brunswick, NJ 08902
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
*notices@dannlaw.com*

Jennifer Czeisler*
Edward Ciolko*
Arturo Pena*
**STERLINGTON, PLLC**
One World Trade Center
85th Floor
New York, New York 10007
*jen.czeisler@sterlingtonlaw.com*

*ed.ciolko@sterlingtonlaw.com*
*arturo.pena@sterlingtonlaw.com*

Adam Pollock
Anna Menkova
**POLLOCK COHEN LLP**
111 Broadway, Suite 1804
New York, NY 10006
Tel: (212) 337-5361
*anna@pollockcohen.com*
*adam@pollockcohen.com*

*pro hac vice forthcoming

*Attorneys for Plaintiff S.G. and
the Proposed Class*